UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NFC ADVISORY, INC.<br><br>       Plaintiffs<br><br>-against-<br><br>ALEXANDER TWINING, and<br>TWINING PROPERTIES LLC<br><br><br><br>       Defendants. | Civil Action No.: |

**COMPLAINT (with Jury Demand)**

This is a complaint arising from unpaid incentive compensation ("bonus"). The claim arises from an agreement between the plaintiff, as assignee, and the defendants, relating to two development projects, one in New Rochelle, New York, and the other in New Haven, Connecticut.

**Parties**

1. Plaintiff NFC Advisory, Inc. (NFC") is a corporation organized under the laws of Delaware, with offices at 1308 Baker Crest Court, McLean, Virginia. NFC is the successor in interest and assignee of Field Point Projects LLC ("Field Point" or "FPP") which, as described below, performed services for Twining and his company Twining Properties LLC.

2. Defendant Alexander Twining is an individual who, on information and belief, resides at 13 River Bank Lane, Old Lyme, Connecticut.

3. Defendant Twining Properties LLC ("TP") is a limited liability company organized under the laws of Delaware. Its managing member is defendant Twining. TP currently reports an address at 125 Park Avenue, New York, New York. At all times relevant to the events below it occupied temporary shared space under a lease with Carr Properties at 200 Park Avenue, New York, New York.

**Background**

4. On August 6, 2018, after weeks of discussions with Twining, acting through TP (the two defendants are referred to collectively as "Twining"), entered into a "Independent Contractor Agreement" ("Agreement") with Field Point to perform consulting services relating to two potential real estate projects that TP was attempting to develop.

5. The Agreement was to run through December 31, 2018. After that date, FPP agreed to continue to work under extensions through December 31, 2019.

6. Laura Kaufman, the principal of Field Point, is a highly experienced real estate executive with a background in mixed-use, multi-family, retail, residential, hotels, and life sciences.

7. Twining was having problems with both of his projects, one in New Rochelle, New York and the other in New Haven, Connecticut.

8. The New Rochelle Project, known as Pratts Landing ("Pratt"), was a 12-acre plot for which there was a master plan calling for residential, hotel, and retail. Twining's ambition called for 800,000 square feet of development.

9. The New Haven Project, known as Winchester Center ("Winchester"), called for the redevelopment of the former Winchester Arms factory into residential, retail and research,

2

the latter planned for life sciences, a unique type of real estate development in which Kaufman had decades of experience.

10. The Agreement had two forms of compensation, typical for the industry.

11. First, Kaufman was to receive base compensation of $20,000 per month.

12. Second, Kaufman was to receive what TP called a "success fee," more commonly known as bonus or incentive compensation. The "success fee" is referred to here as a bonus.

**The Pratt Objective: Environmental Review and Zoning**

13. The bonus was to be based upon "mutually agreed upon objectives" with "defined deadlines" and "values" for each objective. Despite those seemingly clear criteria Twining, who was not very organized, ran his business informally.

14. On her first day working with Twining, Twining established the first of what became two "objectives." It was to complete what is known as the EIS (Environmental Impact Statement) for the SEQRA process for Pratt by the end of 2018.

15. SEQRA, the New York State Environmental Quality Review Act, is a multi-part, complex process that, depending on the facts of a development project, can take well over a year.

16. Kaufman oversaw the preparation of the SEQRA EIS portion of the application and completed it under a tight schedule in just 4 months.

17. Kaufman was responsible for submitting a thorough account of the proposed Pratt project, its environmental context, and identify any potential significant adverse impacts. The EIS (Environmental Impact Statement) addressed reasonable alternatives and mitigation strategies, demonstrating how the project aligns development objectives with environmental stewardship.

18. Key components for the EIS submission included a project description, analysis of existing environmental conditions, detailed impact assessment, evaluation of alternatives and proposed measures to avoid or minimize adverse effects. It was necessary to align the project cost feasibility with the limitations of the impacts

19. At the same time, Kaufman was assigned the task of preparing the DOZ-7 Zoning application to be submitted to New Rochelle.

20. Kaufman managed and completed the DOZ-7 application in the same four month timeframe as SEQRA.

21. Kaufman directed a team of consultants in preparing the DOZ-7 zoning change application. The intensive and detailed process involved drafting the proposed zoning code, articulating the rationale, and conducting a comprehensive analysis of the economic and environmental impacts associated with the project at its maximum permitted scale.

22. The DOZ-7 submission also included a delineation of permitted uses and technical drawings specifying the requirements for the new zone.

**Winchester: $150,000,000 Capital Raise**

23. The second major "objective" was defined in August, 2018. TP and Twining were not established developers with a track record that investors typically sponsored. As a result, he was having difficulty finding the capital needed for the Winchester project.

24. Twining, lacking the credibility of an established developer with banks and other investors, hired a company called HFF to raise capital for him.

25. HFF was paid $1.7 million by Twining to "source capital" but failed at raising any.

26. Twining directed Kaufman to see whether she could fulfill that urgent need, without which the Winchester project would fail before it started.

27. Kaufman looked into several options for Twining and succeeded in arranging for Goldman Sachs Urban Investment Group to consider Twining.

28. Within months, Goldman agreed to participate so long as a partner more experienced that Twining could be brought into the deal.

29. With Goldman's assistance, L+M Development Partners, an established firm, was brought into the deal, which meant that Goldman would invest.

30. Combined, Goldman and L+M invested ~98% of the needed capital, approximately $148,000,000. As a result of Kaufman's efforts, Twining was able to retain the Winchester Project.

31. Based on the fee paid to HFF for its failed efforts to raise capital, the value of Kaufman's services was $1.7 million.

32. Other methods of valuing capital raising are generally 1%-3% depending on amount raised. Assuming 2%, the value of Kaufman's services would be $2,940,000.

**Twining Reneges**

33. Despite Kaufman having completely succeeded at the primary tasks assigned to her, and having done so in a short period of time, Twining paid nothing.

34. Efforts to revolve the matter continued into May 2020 but were unsuccessful.

**COUNT I:  BREACH OF CONTRACT**

35. The allegations in ¶¶1-34 are realleged.

36. FPP, through Kaufman, fulfilled all of the objectives established for the Pratt project, and did so ahead of schedule.

5

37.     FPP, through Kaufman, fulfilled the capital raise objective that saved the beleaguered Winchester project.

38.     Twining's prior efforts to raise capital had failed.

39.     Twining turned to FPP to raise capital when all of his efforts, at great expense, had failed.

40.     The fair market value of the services that Kaufman successfully rendered is ~$3,200,000.

WHEREFORE, Kaufman demands that she be compensated in the amount of $3,200,000, plus 9% statutory prejudgment interest, for her successful completion of the objectives assigned to her, and for which she has never been paid

**COUNT II:  UNJUST ENRICHMENT**

41.     The allegations in ¶¶1-40 are repeated and realleged.

42.     FPP undertook to raise capital in August, 2018 when Twining's efforts, both individually and through HFF, had failed.

43.     Where others had failed, Kaufman succeeded in identifying Goldman Sachs' Urban Investment Group and persuading them to consider investing in Twining's Winchester project.

44.     Twining had never before raised capital from Goldman Sachs.

45.     Twining directly benefited from FPP and Kaufman's efforts because it made it possible for Twining to continue to develop Winchester.

46.     Part of the Winchester project included the Science Park at Yale project. Kaufman had developed that project through her earlier work with Lyme Properties, and was able to

explain the environmental remediation aspects of the project, and the adaptive reuse of the buildings to Goldman in a way that few others were qualified to do.

47. Twining benefited from Kaufman's work by being able to save the Winchester project. He did so at FFP and Kaufman's expense, as they were never compensated.

48. It would be inequitable and defy good conscience for Twining to profit from Winchester when, without Kaufman's capital raise, the project would have failed and Twining would have lost the expense incurred in attempting to develop it.

49. For Twining to have taken Kaufman's efforts without proper market compensation is inequitable.

WHEREFORE, Kaufman demands that Twining, as an alternative to compensation for breach of contract, compensate Kaufman in the amount of $3,000,000.

50. The allegations in ¶¶1-49 are repeated and realleged.

51. FPP and Kaufman provided the real estate services requested by Twining.

52. Twining accepted and benefited from those services.

53. FPP reasonably expected to be compensated for those services as they were expressly requested by Twining, and Twining knew that Kaufman expected to be compensated.

54. The fair market value for the services rendered is $3,200,000.

WHEREFORE, FPP demands that Twining compensate Kaufman in the amount of $3,200,000 for the fair market value of the services rendered to Twining.

NFC ADVISORY INC., Plaintiff

By:

KAUFMAN PLLC

 /s/ Alan H. Kaufman  (*pro hac vice* pending)

Alan H. Kaufman, Esq.
Bar No. ct 29258

KAUFMAN, PLLC
200 Park Avenue, 17th Floor
New York, NY 10167
Tel: (212) 257-0900
Fax: (212) 897-2370
akaufman2@kaufmanllc.net

888 16th Street NW, Suite 800
Washington, D.C. 20006